In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-2746

JIMMY DOE, *et al*., on behalf of a class of detainees,

*Plaintiffs-Appellees*,

*v.*

COOK COUNTY, ILLINOIS, and SUPERINTENDENT, COOK COUNTY
JUVENILE TEMPORARY DETENTION CENTER,

*Defendants-Appellees*.

Appeal of:

TEAMSTERS LOCAL UNION NO. 700,

*Intervenor*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 99 C 3945 — **James F. Holderman**, *Judge*.

ARGUED FEBRUARY 17, 2011 — DECIDED AUGUST 17, 2015

Before EASTERBROOK, RIPPLE, and TINDER, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. This suit began in 1999, when
a group of detainees at the Cook County Juvenile Temporary
Detention Center, which houses juvenile suspects awaiting

trial, contended that some personnel at the Center violated
the federal Constitution by abusing their charges. (Plaintiffs'
status as juveniles justifies the anonymity in the case title.)
Eight years into the suit, which has been certified as a class
action (so the fact that the representative plaintiffs are no
longer at the Center does not make the case moot), the dis-
trict court appointed Earl Dunlap as the Center's "Transi-
tional Administrator." We call Dunlap "the Administrator."

The court authorized the Administrator to run the Center
in compliance with all state and federal requirements. The
word "Transitional" in the Administrator's title comes from
the fact that Illinois amended its law in 2007 to move man-
agement of the Center from the domain of the County's po-
litical branches to the domain of the Circuit Court of Cook
County, in whose Chief Judge state law now vests authority.
55 ILCS 75/3(b) (allowing the Chief Judge to appoint and
remove an administrator to run the Center), 75/3(c) (giving
the Chief Judge direct control over the Center's budget). The
Administrator was supposed to produce an orderly transi-
tion from the old regime to the new one.

That took a good deal longer than expected. Section
75/3(b) became effective on January 1, 2008, and required the
Chief Judge to appoint a new head of the Center within 180
days, yet when this case was argued in 2011 the appointment
had yet to be made. We thought that the transition would
happen soon, and we deferred action in the belief that the
dispute might soon become moot. It turned out that the
Chief Judge waited until May 2015 to replace Dunlap: Leon-
ard Dixon was named as the Center's new Superintendent
effective May 20, 2015, and Dunlap left his post as Adminis-
trator. But this has not resolved the controversy that led to

this appeal. So it is time for us to act—past time, really, and the litigants have our apologies for the delay.

One reason why we thought it appropriate to set this appeal aside for a while is that the original parties were and remained content with the Administrator's appointment and actions. The plaintiffs are satisfied, Cook County is satisfied, and the Chief Judge of the Circuit Court, though not a formal party, indicated (through a supplemental submission filed at our request) that he too is satisfied. But employees at the Center are not satisfied. Their Union (Teamsters Local 700), which represents "direct-care employees" (called "Juvenile Detention Counselors" and "Recreation Workers"), intervened in the district court and is the appellant.

We postpone a recitation of this litigation's origination, settlement, reactivation, re-settlement, and further protests by the class, which led the district judge to appoint the Administrator as part of a third settlement. For now it is best to explain what led the Union to intervene and appeal, and how the district court dealt with the Union's arguments.

Following a study of the Center's operations, the Administrator proposed in October 2009 to reorganize it into five divisions, each staffed by personnel who in one position serve the functions of guards, psychologists, and teachers, and who would have training and educational credentials superior to the staff then on hand. The Administrator proposed to terminate the employment of the Center's approximately 225 direct-care employees and require any of them who wanted to fill the new positions to apply on the same basis as any outsider would do. The Administrator estimated that 180 of these 225 would be disqualified at the outset by the requirement that the workers have bachelor's degrees,

and more would be ruled out by a test that all applicants would be required to pass.

The district court allowed the Union to intervene to oppose the Administrator's plan. (The Union acts as agent of its members, who are vitally interested, and has standing in a representative capacity.) The Union argued that implementation of the plan would violate several Illinois statutes. Illinois requires public employers to engage in collective bargaining with unions, 5 ILCS 315/7, and it requires arbitration if an employer of "security employees" cannot reach agreement with their union, 5 ILCS 315/14. The Union contended that the Administrator was proposing to violate state law by overriding the bargaining and arbitration statutes, and to violate the Due Process Clause by overriding the current collective bargaining agreement. For simplicity we put this latter argument to one side; it is unnecessary to add a constitutional gloss to state-law rights.

The district court rejected the Union's position and authorized the Administrator to implement his plan. 2010 U.S. Dist. LEXIS 63153 (N.D. Ill. June 23, 2010). Citing 5 ILCS 315/4, the judge wrote that collective-bargaining rights must give way, as a matter of Illinois law, when necessary to effective management. See *Central City Education Association v. Illinois Educational Labor Relations Board*, 149 Ill. 2d 496 (1992). The judge did not, however, find that overriding the right to bargain was essential to solve any constitutional problem at the Center. To the contrary, the judge conceded that "there has been no judicial finding that 'purging the [Center of incumbent workers] is necessary to correct'" any ongoing constitutional violation. 2010 U.S. Dist. LEXIS 63153 at *19. Indeed, the judge conceded that there has not been a finding

that any resident of the Center "*currently* face[s] an 'ongoing danger to health and safety [due to] unqualified staff stay[ing] in their current positions'" (*ibid.*; emphasis and brackets in original). Nonetheless, the judge wrote, the Administrator had been appointed to clean up a mess, and "the court finds that the [Administrator's] need for speed and flexibility" (*id.* at *20) trumps other considerations.

Addressing the Union's argument that the Administrator's hiring plan is blocked by 18 U.S.C. §3626, a part of the Prison Litigation Reform Act (PLRA), given the absence of a finding that the new plan is necessary to cure an ongoing violation of federal law, the district court had two responses: first, that Illinois law has not been violated, and second that §3626 applies only to district judges and not to court-appointed administrators. 2010 U.S. Dist. Lexis 63153 at *27–28. What the Administrator proposed to do, the court wrote, is not the kind of "prospective relief" forbidden to a judge.

The district court denied a motion for a stay, 2010 U.S. Dist. Lexis 117086 (N.D. Ill. Nov. 3, 2010), as did a motions panel of this court, so by the time we heard oral argument the new system was in place. The judge certified his order as final under Fed. R. Civ. P. 54(b), see 2010 U.S. Dist. Lexis 86192 (N.D. Ill. Aug. 23, 2010), a step that everyone has applauded given the difficulty of determining whether an order such as that approving the Administrator's plan is one entering (or declining to modify) an "injunction" for the purpose of an appeal under 28 U.S.C. §1292(a).

The Union's appeal rests largely on the PLRA. Here are the pertinent parts of §3626:

(a) REQUIREMENTS FOR RELIEF.—

    (1) PROSPECTIVE RELIEF.—

        (A) Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

        (B) The court shall not order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless—

            (i) Federal law requires such relief to be ordered in violation of State or local law;

            (ii) the relief is necessary to correct the violation of a Federal right; and

            (iii) no other relief will correct the violation of the Federal right.

…

(c) SETTLEMENTS.—

    (1) CONSENT DECREES.—In any civil action with respect to prison conditions, the court shall not enter or approve a consent decree unless it complies with the limitations on relief set forth in subsection (a).

    (2) PRIVATE SETTLEMENT AGREEMENTS.—

        (A) Nothing in this section shall preclude parties from entering into a private settlement agreement that does not comply with the limitations on relief set forth in

subsection (a), if the terms of that agreement are not subject to court enforcement other than the reinstatement of the civil proceeding that the agreement settled.

…

(g) DEFINITIONS.—As used in this section—

(1) the term "consent decree" means any relief entered by the court that is based in whole or in part upon the consent or acquiescence of the parties but does not include private settlements; …

(6) the term "private settlement agreement" means an agreement entered into among the parties that is not subject to judicial enforcement other than the reinstatement of the civil proceeding that the agreement settled; …

The Union's argument is simple. Section 3626(a)(1)(A) and (B) forbids relief that violates state law and is not "necessary" to solve a violation of federal law—and even then state law may be overridden only if "no other relief will correct" that violation. A private settlement agreement may do more, see §3626(c)(2), but if an agreement is judicially enforceable—that is, if a violation means anything other than restarting the litigation on the merits—the agreement must be treated as a "consent decree," and what a court cannot do by final order in a contested case it also cannot do by the parties' consent (that's the effect of combining §3626(c)(1) and (2) with §3626(g)(1) and (6)).

The district judge was unimpressed by this argument because, he said, it does not invariably violate Illinois law to allow management to proceed without collective bargaining. We grant the point but don't see how state law authorizes cutting this Union out of decisions about the Center's staffing.

The district court thought that bypassing bargaining (and eliminating the arbitration that state law requires if the parties can't agree) would allow the Administrator to reorganize the Center faster and more effectively. Yet every public employer could make that kind of argument, all of the time. There has to be something more to bypass bargaining as a matter of Illinois law; the delays and frustrations that normally accompany collective bargaining do not permit an employer to dispense with the process, irksome as many employers find it. Illinois courts, and its Labor Relations Board, regularly reject arguments that a public employer's desire to change conditions of employment with dispatch justifies disregard of bargaining and arbitration requirements. See, e.g., *Chicago Park District v. Illinois Labor Relations Board*, 354 Ill. App. 3d 595 (2004); *Village of Bensenville*, 14 PERI ¶2042, 1998 IL LRB LEXIS 43 (I.L.R.B. 1998); *Cook County (Cermak Health Services)*, 3 PERI ¶3030, 1987 IL LRB LEXIS 78 (I.L.R.B. 1987).

The "something more" required by Illinois law could in principle be an ongoing violation of federal law, but the district judge was commendably candid: he was *not* finding any ongoing violation that the Administrator's plan would fix and, indeed, had *never* found any violation of federal law (statutory or constitutional). (We'll come back to the "never" observation.) The judge found that giving speed and flexibility to the Administrator would be beneficial, but not that federal law requires this, and not that every employer's desire for flexibility trumps bargaining requirements in Illinois. It follows that Illinois law required collective bargaining and held out the possibility of interest arbitration.

Even if we were to treat the parties' agreement as giving the Administrator the power to do what he did, employers cannot "consent" to dispensing with employees' rights. See *Kasper v. Board of Election Commissioners*, 814 F.2d 332, rehearing denied, 814 F.2d 345 (7th Cir. 1987) (parties can't accomplish through a consent decree something they lack ability to do by contract). And under §3626(a)(1)(B) the parties, like the court, must respect state law unless federal law leaves no other option.

The district court's second way around the PLRA was its conclusion that the judge had not himself required any change in the Center's employment practices; all the court had done was to approve the Administrator's proposals. There are several problems with that approach. First, the Administrator was exercising the court's authority. Without the court's imprimatur, the Administrator has no authority at all. The court cannot give its appointee any greater power than the judge himself possesses. If the judge is constrained by §3626, so is the Administrator. Second, §3626(a) says exactly this. It provides that a "court shall not grant *or approve* any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." (Emphasis added.) The court approved the Administrator's directives, without making the statutory findings.

Simple enforcement of a consent decree does not require a new round of findings under §3626. See *Jones-El v. Berge*, 374 F.3d 541, 545 (7th Cir. 2004). But the Administrator's decision to fire all of the Center's direct-care workers, and displace state law, cannot be understood as simple enforcement

of the order appointing the Administrator. That order, entered in 2007, did not displace state labor law or authorize any particular management practice. Not until 2010, when the district court approved the Administrator's proposal, was state law superseded. (As we explain below, there was a brief supersession in 2008, but the district court quickly revoked it.) The 2010 order therefore cannot be defended as nothing but implementation of the 2007 order appointing the Administrator.

The dispute in *Jones-El* concerned an order to install air conditioning to enforce an earlier decree that had directed the prison to reduce the temperature in prisoners' cells. The prison objected to the new order, even though it also conceded that air conditioning was the *only* way to comply with an earlier order whose validity was unquestioned. In our case, by contrast, firing all of the direct-care workers and hiring replacements, all without regard to state law, was not the only way to comply. The district judge did not find that the Administrator's proposed approach was necessary either to respect the class's rights or to manage the Center (as the 2007 order authorized the Administrator to do); the judge found only that it was efficient. The difference between a step necessarily entailed in implementing an earlier judicial order, and a selection from among many potential ways of proceeding, was important to *Jones-El* and to our decision today.

But if we accept the premise that in 2010 the district court just enforced an older consent order, that moves things one step backward, to the 2007 order appointing the Administrator and setting out his tasks. And the district court did not say that *that* order was compelled by any federal law. The most one can say for the 2007 order is that the district judge

recited that it complied with the PLRA. The judge did not, however, make any of the findings that §3626 requires. A bald declaration of compliance, without the findings required by statute, is ineffectual under §3626.

In defending the judgment, the original parties have argued that the district judge didn't need to make any findings in 2010 because he had made them earlier. As we have observed, the judge himself was not of that view. He stated expressly that he was not finding that there was any ongoing violation of federal law that needed correction and was not finding that the Administrator's new employment proposal was necessary to correct any earlier violation. 2010 U.S. Dist. Lexis 63153 at *19. But for the sake of completeness we take a brief look at this litigation's history, to see whether the judge's memory might have been deficient.

The suit was filed in 1999, and the parties started negotiating. The district court did not take any action on the merits (though it did certify a class). Settlement was reached in 2002, and in December of that year the district court dismissed the suit, reserving jurisdiction to enforce the settlement's terms. (This reservation made the settlement a "consent decree" as defined in §3626(g)(1), as opposed to a "private settlement agreement" under §3626(g)(6).) In dismissing the suit, the judge did not make any finding that the Center had violated any detainee's rights or that any of the settlement's terms was necessary to remedy a violation.

Nor could either of these findings be inferred from the act of approving (and promising to enforce) the settlement, because the settlement papers themselves state that the agreement is "the result of a compromise and settlement and is not a determination of liability." The settlement contained

standard language denying liability. (For example: "Defendants have denied and continue to deny the allegations contained in Plaintiffs' Complaint".) In other words, the defendants did not confess liability, and there was no finding of liability (or of the need for any given remedy) that the court could adopt. What is more, the court *could not* have found that a new employment arrangement at the Center was necessary to resolve any violation, because the possibility of a new arrangement was not raised until 2009.

By late 2005 plaintiffs had grown dissatisfied with the Center's performance. They moved to reopen the case and enforce the settlement. Before the court could act, the parties reached an amended settlement and an implementation plan. The two new agreements, like the original, lack a confession of liability. Unlike the 2002 settlement, the 2006 agreements dealt with employment and training by providing that the Center must reassign any employee found to have physically abused any detainee, until the employee receives additional training. The Administrator's eventual proposal is substantially different from this clause, because it extends to *all* employees, whether or not any given employee ever abused any detainee, and whether or not that employee has received additional training.

In May 2007 the plaintiffs returned to court, asking the judge to put the Center into receivership and appoint someone to run it. By then the state legislature was considering the bill that would move the Center's management to the Circuit Court of Cook County. This led to the idea for a "Transitional Administrator" to bridge the gap, and with the parties' consent (a third settlement) the district court appointed Dunlap to that position—but without making any

finding that in 2007 the Center was violating anyone's federal rights. Instead the judge found that the Center was violating the terms of the 2002 and 2006 settlements—which were based on compromise rather than a finding by the court that anyone's federal rights had been or were being violated. The order appointing the Administrator provides that he is "an agent of this Court" (which is one of the reasons why we concluded above that the Administrator's acts are attributed to the court for the purpose of §3626).

In mid-2008 the Administrator reported that the Center was understaffed and needed more than 175 additional employees quickly in order to improve detainees' care. The district court made a factual finding to that effect—which so far as we can see is the *only* factual finding in the case—but did not conclude that federal law requires additional employees. The Administrator proposed to hire the new workers by contracts that bypassed the Union and its collective bargaining agreement. The district judge authorized this, entering an order "suspend[ing] any and all laws … that require compliance with any provision of the current Collective Bargaining Agreement". The judge did not find, however, that superseding state law was the least restrictive way to rectify a violation of federal law; the order did not reference §3626. The Union protested, and the judge soon revoked the suspension clause of his order. That put state labor laws back into effect. The Union effectively promised not to complain about the new hires, however, if the Administrator respected its members' rights.

This brings us to October 2009, when the Administrator proposed to abrogate all of the Union's rights by firing its members and hiring a wholly new staff without regard to

state labor laws or the existing collective bargaining agreement, a process that everyone understood would mean unemployment for at least 180 of the Union's members. And, as we've explained, when approving this proposal in June 2010 the judge stated that he was not finding any existing violation of federal law and was not finding that the restaffing plan was necessary to correct any violation. The judge denied that the PLRA applied at all to the Administrator's acts, but he did not find in 2010 that it has been satisfied if it does apply.

The lack of factual findings in this case—both the lack of findings about the existence of a violation and the absence of findings about the necessity for a particular remedy to cure any violation—contrasts with the elaborate findings the district court made in *Brown v. Plata*, 131 S. Ct. 1910 (2011), the Supreme Court's only extended consideration of §3626(a) and (b). The Justices divided five to four about whether even 184 pages of findings and analysis by a district court satisfied the statutory burden; the difference from this case could not be more stark.

It follows that the order approving the new staffing plan must be reversed. The plan has been in effect for years, and restoring the Union's members to their old positions would not be possible, because those positions are gone. But other forms of relief, including financial compensation and preferential hiring for future openings, may be appropriate, and we leave that subject to the district court on remand.

Nothing in this opinion should be read to undermine the original settlement in 2002 or the follow-up settlements in 2006. The Union has not questioned them (and would lack standing to do so), and the original litigants remain satisfied.

As we mentioned earlier, the Chief Judge also is satisfied with the provisions of the 2002 and 2006 settlements (which the PLRA treats as consent decrees). And the Chief Judge's appointment of a new Superintendent for the Center moots any prospective contest to the Administrator's 2007 appointment. The only question we resolve is whether the 2010 order permitting the Administrator to bypass state employment law (a power not conferred in 2007) complied with §3626, and we have held that it did not.

The decision is reversed, and the case is remanded for proceedings consistent with this opinion.

RIPPLE, *Circuit Judge*, dissenting. This is an important case both to the parties and to the development of the law in this circuit. Given the disposition reached by my colleagues, it is also imperative that the matter be returned quickly to the district court. That court issued a final order on May 15, 2015. Under its terms, the Transitional Administrator is scheduled to report to the parties on the status of the transition and on the compliance of the parties by August 17, and the reservation of jurisdiction to enforce the consent decree will terminate on September 16. The account of the Office of the Transitional Administrator is scheduled for closure on September 30, 2015. While I respectfully disagree with my colleagues' resolution of the matter, the need to get this case back to the district court is an imperative that must be paramount. I therefore am constrained to abbreviate my own writing in order to ensure that the district court and the parties are advised of this court's decision immediately.

**A.**

In my view, this case does not implicate directly the content of the consent decree. As the district court noted explicitly, the order before us is a simple direction enforcing or implementing that consent decree and therefore is not governed by the provisions of the PLRA *ex proprio vigore*.[1] In the course of enforcing or implementing a consent decree, district courts must issue a variety of orders to address particular situations that inevitably arise. In the consent decree, the parties had recognized and agreed that the personnel situation in the Center had to undergo significant

---

[1] *See* R.589 at 17.

change in order to ensure that the previous treatment of the children came to a permanent end. The decree gives the Transitional Administrator the responsibility, set out in some detail in the decree, to achieve a cessation of the current situation through the implementation of personnel policy changes. The order appointing the Transitional Administrator, which the district court quite properly considered an integral part of the decree, specifically gives the Transitional Administrator the authority "to establish personnel policies; to create, abolish, or transfer positions; and to hire, terminate, promote, transfer, and evaluate management and staff of the JTDC."[2]

In the course of his work under the consent decree, the Administrator determined that certain academic qualifications were necessary for those employees in direct and constant contact with the residents. The Union challenged his authority to make these changes. The district court had allowed the Union to intervene in the case *for a specific and limited purpose*, which included objecting to the Transitional Administrator's plan.[3] After hearing from the

---

[2] R.330 at 7, § 6(c).

[3] The motion to intervene by the Union that ultimately was granted concerned a prior emergency motion by the Transitional Administrator to dispense with particular paragraphs in the bargaining agreement in order to hire an outside contractor to handle certain discrete tasks in the JTDC, which would require reassignment of current staff. The court approved the emergency motion over the Union's objection, later amending it to the Union's satisfaction. In its order granting the emergency motion, the court required a report by the Transitional Administrator "on the conditions and status of the issues raised" in the emergency motion. R.415 at 4. In the second of such reports, the Transitional Administrator included his proposed staffing plan. The

parties and the Union, the district court held that the Transitional Administrator's solution was within his authority and not in violation of state law. The court pointedly noted that the court was not ordering the implementation of the Transitional Administrator's plan but simply declaring that his action was within his authority under the consent decree.

The Supreme Court noted in *Brown v. Plata*, 131 S. Ct. 1910 (2011), that, once properly invoked, "the scope of a district court's equitable powers … is broad, for breadth and flexibility are inherent in equitable remedies." *Id.* at 1944 (alteration in original) (internal quotation marks omitted). Our court has long recognized, moreover, a basic distinction between the terms of a consent decree and the periodic orders that interpret, enforce and implement its terms. *See Jones-El v. Berge*, 374 F.3d 541, 545 (7th Cir. 2004). The distinction is, to put it mildly, not a novel one, and certainly one that we must assume that Congress understood in crafting the present provisions of the PLRA. In the PLRA, Congress mandated, as Supreme Court decisions already had done, that the terms of a federal court judgment be aimed at a "condition that offends the Constitution."[4] The statute's concern is with whether the court's judgment or decree is aimed at a federal constitutional violation and whether the court has chosen a means tailored to rectify that

court approved the report over the Union's objection, resulting in the present appeal.

[4] *Milliken v. Bradley*, 418 U.S. 717, 738 (1974) (internal quotation marks omitted); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971).

violation once these parameters are set, as they were in this case. Here, the Union brought no challenge against the consent decree but merely challenged whether a certain action fell within its scope and was otherwise permissible under state and federal law.

No doubt, the PLRA does require that a court give substantial weight to public safety and adopt a remedial device that is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right," *see* 18 U.S.C. § 3626(a)(1), but this statutory admonition, a codification of well-established principles of federal equitable jurisprudence in constitutional cases, must

> not be interpreted to place undue restrictions on the authority of federal courts to fashion practical remedies when confronted with complex and intractable constitutional violations … .

> Courts should presume that Congress was sensitive to the real-world problems … [that] would remedy constitutional violations in the prisons and that Congress did not leave prisoners without a remedy for violations of their constitutional rights.

*Brown*, 131 S. Ct. at 1937.

Here, the district court explicitly noted that the question before it was a limited one: whether the Transitional Administrator was authorized to take action under the

consent decree and under state and federal laws.[5] The court answered these questions in the affirmative. Indeed, it did not undertake to alter in any way the consent decree or to vest additional authority in the Transitional Administrator. It did not tell him that he had to implement his personnel plan; it simply told him that he was empowered to do it.

The district court in no way violated the PLRA in its handling of the Union's limited objection.

## B.

My colleagues conclude their opinion by stating that it should not be read to undermine the validity of the various

---

[5] My colleagues find fault with the district court's resolution of the question of the Union's right to bargain as a matter of state law. The district court's decision was based on its assessment of the limited arguments put before it. That is, it had determined that state law required application of a fact-specific balancing inquiry and stated that the Union had "fail[ed] to address in practical terms the anticipated benefits of bargaining." R.589 at 11. The Transitional Administrator, on the other hand, "ha[d] gone through great efforts to explain the particular reasons for and policies underlying his decision … and how these standards relate to his court-mandated mission." *Id.* at 12. The court noted that "it is undisputed that approximately half of the JTDC's current residents are housed in units structured on the old JTDC 'system'—a system that was to be 'restructured' by court order." *Id.* (citation omitted). Only then, after stating that the Union had not shown specific benefits of bargaining and that the countervailing interests were great, did it conclude that "the benefits of bargaining do not outweigh the burdens" and thus there was no state law right. *Id.* In my view, this conclusion is not about the need for speed and flexibility as an overriding justification, but about a failure of the Union to present the court with sufficient alternate considerations to be balanced.

settlement documents entered in this case. On this point, we are in agreement, and I write separately to emphasize that the court's searching review of the district court record should not give the impression that we had undertaken to examine earlier decrees, not the subject of this appeal, for their separate compliance with the PLRA.[6] There are multiple reasons, including those mentioned by the majority, that these questions were not presented in the present appeal. First, the statute contains a specific way to challenge

---

[6] Whether a consent decree involving prisons *always* requires, as a prerequisite to the entry of a remedy, a judicial finding of an *actual* constitutional violation *even when the parties do not request such a finding* is a very difficult question, one that we ought to approach only in a case where resolution is absolutely necessary and where the matter has been briefed fully by the parties to the litigation. While a case can be made that the PLRA requires such a judicial finding, *see* Deborah Decker, *Consent Decrees and the Prison Litigation Reform Act of 1995: Usurping Judicial Power or Quelling Judicial Micro-Management?*, 1997 Wisc. L. Rev. 1275, 1278; *see also, e.g., Plyler v. Moore*, 100 F.3d 365, 370 (4th Cir. 1996) (deciding the question *sub silentio* in the context of a proceeding under 18 U.S.C. § 3626(b)(2)), the question becomes a great deal more difficult when we remember that such a requirement would, as a practical matter, make the whole idea of a consent decree superfluous. Consent decrees are sought by defendants, especially state and local defendants, to permit the implementation of a remedy without an admission or judicial finding of liability, an admission or finding with dire collateral consequences for state and municipal defendants. If, as the Supreme Court has admonished in *Brown v. Plata*, 131 S. Ct. 1910 (2011), we ought to be hesitant in interpreting the PLRA to attribute to Congress a motivation in the PLRA to leave prisoners without a remedy for violations of rights protected by the Constitution, we ought to be equally careful not to attribute to that body the motivation to make illusory the one mechanism by which both incarcerated individuals and local governments can resolve such litigation relatively expeditiously and inexpensively while maintaining a good deal of control in local hands.

a non-conforming decree, 18 U.S.C. § 3626(b), but the parties have never invoked that section and, to this day, see no reason to challenge the district court's determination that the consent decree is in conformity with the statute. The Union, whose intervention was limited to the question of whether the Temporary Administrator's personnel action was consistent with the consent decree, has given the question wide berth. Some of its filings in the district court raise the matter, at least obliquely, but it never asked the court to hold a hearing to consider squarely this question.[7]

Further, in any event, the district court explicitly said that, with respect to the consent decree, the requirements of the PLRA were met.[8] Portions of my colleagues' opinion could be read as suggesting that the district court never made findings sufficiently detailed to satisfy the statute. However, the plain language of the statute does not require any particular degree of detail and, here, no party has ever disputed the objectives of the consent decree. Nor does any party contend that the terms of the consent decree are not designed precisely to deal with the problem. No doubt, if there is a dispute on whether a condition offends the

---

[7] The district court was clear on this point:

> Although the Union hints that the consent decrees … may no longer be necessary to correct any underlying constitutional violations, the Union does not go so far as to request an evidentiary hearing on this question, nor does the Union actually ask the court to terminate these orders pursuant to 18 U.S.C. § 3626(b).

R.589 at 17 (citations omitted).

[8] *See id*.

Constitution or whether the means to address it are narrowly tailored, more specific findings would be required. *See Cason v. Seckinger*, 231 F.3d 777, 784 (11th Cir. 2000). This situation often arises on a motion to terminate or modify a consent decree, a motion the Union never made. *See* 18 U.S.C. § 3626(b). Indeed, if termination is deemed proper and the decree is continued, the district court must make particularized findings. *See* 18 U.S.C. § 3626(b)(3); *Ruiz v. United States*, 243 F.3d 941, 950–51 (5th Cir. 2001).

With great respect for the contrary view of my colleagues, I would affirm the judgment of the district court and allow this litigation to come to a peaceful and successful end.