In the

# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 19-1145, 19-1375 & 19-1978

ASHOOR RASHO, et al.,

*Plaintiffs-Appellees*,

*v.*

ROB JEFFREYS, Director of the Illinois
Department of Corrections, and MELVIN HINTON,
Acting Statewide Mental Health Supervisor
of the Illinois Department of Corrections,

*Defendants-Appellants*.

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 07-C-1298 — **Michael M. Mihm**, *Judge*.

_____

ARGUED MAY 20, 2020 — DECIDED JANUARY 12, 2022

_____

Before SYKES, *Chief Judge*, and RIPPLE and KANNE, *Circuit Judges*.

SYKES, *Chief Judge*. Ashoor Rasho, on behalf of a class of mentally ill inmates in the custody of the Illinois Department of Corrections ("IDOC"), sued IDOC officials for failing to provide constitutionally adequate mental-health care. The

parties eventually reached a settlement requiring IDOC to meet certain benchmarks across more than a dozen areas of mental-health treatment. A year later IDOC had failed to substantially comply with several portions of the agreement, so the plaintiffs returned to the district court for relief. Under the terms of the agreement, they needed to prove that the defendants' breach itself caused an Eighth Amendment violation.

The district judge held that the plaintiffs made such a showing in five areas of mental-health treatment and noted that IDOC's deficiencies were primarily attributable to a chronic, severe shortage of mental-health staff. Because IDOC had known about its staffing problem for several years and displayed a "lack of a sense of urgency" in fixing the issue, the judge concluded that the defendants were deliberately indifferent to the risk of harm associated with inadequate mental-health care. He entered a permanent injunction requiring IDOC to hire and maintain a specific minimum number of staff in multiple areas of care and imposing other specific requirements for the delivery of mental-health services—all on a court-imposed, mandatory timetable.

We reverse the district court's order and vacate the injunction. IDOC officials took reasonable steps to cure the deficiencies identified by the plaintiffs—in particular, the understaffing—and those actions cannot be squared with the judge's finding of deliberate indifference. Even if those steps were not fully successful, their reasonable effort to address a known risk of harm shows that they did not recklessly disregard that risk.

The court's order also exceeds the remedial limitations set by the Prison Litigation Reform Act ("PLRA"). In the corrections context, prospective remedies must be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). The permanent injunction goes well beyond these bounds by prescribing specific staffing levels and treatment timelines without evidence that such requirements go no further than necessary to correct an Eighth Amendment violation.

## I. Background

The details of this lengthy litigation are largely irrelevant for present purposes. Here are the basics: in 2007 Rasho filed a pro se § 1983 complaint against several IDOC officials claiming that IDOC's treatment of his mental illness was constitutionally deficient in violation of the Eighth Amendment.[1] With the help of counsel, Rasho amended his complaint to assert the same claim on behalf of a proposed class of all mentally ill IDOC inmates. The class-action complaint sought declaratory and injunctive relief compelling IDOC to overhaul its system of mental-health care. After the district court certified the class, the parties spent years in protracted settlement negotiations.

The parties entered into a comprehensive settlement agreement in 2016, almost ten years after the suit was filed. The agreement requires IDOC to make dozens of changes to

---

[1] The identity of the defendants has changed over time. The current defendants are IDOC's Director and Acting Statewide Mental Health Supervisor.

its mental-healthcare system, including implementing a revised screening system for new inmates, providing individualized mental-health treatment plans, and augmenting mental-health staff. The parties appointed Dr. Pablo Stewart to monitor IDOC's compliance. They also agreed to cabin the judge's authority to fashion relief for violations of the agreement: "[A]ny order granting such relief must include a finding that the relief sought is narrowly drawn, extends no further than is necessary to correct the violation of the federal right, and is the least intrusive means for doing so." This remedial constraint, lifted verbatim from the PLRA, effectively prohibits judicial enforcement unless IDOC's noncompliance causes an Eighth Amendment violation—the "federal right" at issue. The district court retained jurisdiction to oversee compliance with the agreement.[2]

Dr. Stewart's first annual report, released in June 2017, sharply criticized IDOC's progress in fulfilling the agreement. After analyzing IDOC's compliance in exacting detail, Dr. Stewart reached a blunt bottom line: "[T]he lack and quality of psychiatric services negatively impacts all aspects of the Settlement and contributes to IDOC being noncompliant in the vast majority of areas of the Settlement." Stewart's concerns persisted for several months, leading him

---

[2] As such, the agreement is more accurately described as a consent decree rather than a private settlement. *See Doe v. Cook County*, 798 F.3d 558, 562–63 (7th Cir. 2015) (explaining that under 18 U.S.C. § 3626, "if an agreement is judicially enforceable—that is, if a violation means anything other than restarting the litigation on the merits—the agreement must be treated as a 'consent decree'"). That distinction is irrelevant for our purposes, so we use the terms "settlement" or "agreement" for consistency with the nomenclature adopted by the parties and the district court.

to write to Dr. Melvin Hinton, IDOC's Chief of Mental Health, that IDOC was "in a state of emergency." On the heels of this letter, the plaintiffs moved for a preliminary injunction, focusing on IDOC's noncompliance in five areas identified by Dr. Stewart: mental-health evaluations, treatment planning, medication management, crisis care, and segregation care.

The judge held an evidentiary hearing on the plaintiffs' motion over six days in late 2017 and early 2018. Witness testimony revealed that IDOC had clearly made progress in revamping its mental-healthcare system: it spent $45 million to build new residential treatment units at several facilities and $75 million to develop a new data system for intake assessments; it procured another $150 million to construct a new inpatient facility; it delivered mental-health training to its entire staff; and it hired administrative personnel to coordinate inmate care. Nevertheless, witnesses for both the plaintiffs and defendants opined that IDOC still could not provide treatment at the level required under the agreement. Undisputed testimony attributed IDOC's shortcomings to systemic shortages in mental-health staff. Dr. Hinton admitted that IDOC budgeted for 65 psychiatrists but currently employed less than half that many.

In May 2018 the judge entered a preliminary injunction. He concluded that IDOC's "persistent" staffing deficiencies had created an "emergency situation" and that IDOC's failure to address those deficiencies—despite being aware of them for "an unreasonable period of time"—amounted to deliberate indifference. He therefore ordered IDOC to take measures to address the five areas identified by the plaintiffs

and to "provide sufficient staff" to remedy the constitutional violations in those areas.

Two days later Dr. Stewart delivered his second annual report, again finding that IDOC was noncompliant in the same areas. The plaintiffs moved for a permanent injunction on the same grounds as the preliminary injunction.

Over several days in August and September 2018, the judge held an evidentiary hearing on the permanent-injunction motion. The parties agreed that pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, the judge should also consider the evidence presented at the preliminary-injunction hearing. The new evidence told a familiar story: inadequate staffing had caused backlogs in inmate care, failures to tailor treatment to individual needs, and an overall inability to satisfy the terms of the settlement in the same five areas.

Still, the evidence also showed that the situation had improved in the first half of 2018. Importantly, IDOC had taken several steps to cure the personnel shortage, including:

- increasing the number of full-time-equivalent psychiatric providers from 33.53 to 50.55 and qualified mental-health professionals from 111 to 117;[3]
- authorizing unlimited overtime;
- partnering with a local university to provide psychiatric care;
- expanding use of telepsychiatry;

---

[3] "Full-time equivalent" or "FTE" describes an employee who works 40 hours per week. A 0.5 FTE employee, for example, works 20 hours per week.

- offering travel stipends and bonuses for providers willing to take on extra work at different facilities;
- setting salaries at the 90th percentile nationwide; and
- coordinating with state officials to streamline the licensing process for IDOC psychiatric providers.

These measures, along with revisions to care procedures, contributed to a decrease in treatment backlogs at several facilities.

IDOC witnesses also testified about the difficulties of recruiting mental-health professionals in the corrections field. A nationwide shortage left 57% of Illinois counties without *any* such professionals, and it was hard to persuade medical professionals to move (or commute) from major cities to work in the challenging corrections environment. As a result, Wexford Health Sources, IDOC's staffing vendor, struggled to meet recruitment goals.

The judge granted the plaintiffs' motion for a permanent injunction.[4] *Rasho v. Walker*, 376 F. Supp. 3d 888, 892–93 (C.D. Ill. 2019). Before addressing IDOC's deficiencies in the five specific areas at issue, the judge emphasized that his finding was "based generally on the fact that there is insufficient mental health staffing at … IDOC." *Id.* at 901. Although he acknowledged that IDOC had made some improvements, he found that the use of unlimited overtime was "unsustain-

---

[4] In addition to the initial order, the judge also issued a slightly modified order in response to IDOC's postjudgment motion and a final order in response to the plaintiffs' motion that the orders be altered to comply with Rule 65(d) of the Federal Rules of Civil Procedure. IDOC appealed from all three orders. We consolidated the appeals and focus on the April 22, 2019 final order, reported at *Rasho v. Walker*, 376 F. Supp. 3d 888 (C.D. Ill. 2019).

able" and that IDOC's "efforts have been generally ineffective—and have gone on far too long without any significant attempt to adapt or modify based on the knowledge gained from their recruiting efforts." *Id.* at 906–07. The judge also criticized IDOC for continuing to rely on Wexford and for exhibiting an "overall lack of a sense of urgency" in delivering adequate mental-health care. *Id.* at 916. As the judge saw it, this all added up to deliberate indifference.

Against this backdrop, the judge issued an extensive injunction addressing staffing and the five areas at issue. The essential terms of the order are summarized as follows:

**(1) Staffing.** Within 90 days, IDOC must employ "7 Site Mental Health Service Directors; 12 Mental Health Unit Directors; [16] Staff Psychologists; 142.5 Qualified Mental Health Professionals; 102 Behavioral Health Technicians; 54.5 Registered Nurses—Mental Health; 24 Staff Assistants; 85.5 Psychiatric Providers; 1 Director of Nursing—Psychiatric; [and] 5 Recreational Therapists." *Id.* at 919–20. The order includes job descriptions for several of these positions and requires follow-up reporting and evaluation. The judge drew the staffing numbers from a 2014 Remedial Staffing Plan that IDOC voluntarily offered during settlement negotiations. *Id.* at 919–21.

**(2) Crisis care.** IDOC may use crisis care only for a patient dangerous to himself or others or upon a finding by a mental-health professional that no less restrictive treatment is appropriate. A mental-health professional must conduct a confidential, daily assessment of a patient's progress and update the patient's treatment plan no later than the time of discharge. For patients who do

not stabilize, the treatment team must establish a plan to provide a higher level of care or explain in writing why establishing such a plan is not appropriate. *Id.* at 922–23.

**(3) Segregation.** A mental-health professional must assess and document an inmate's condition upon placement in segregation. For any inmate in segregation for 16 days or more, IDOC must conduct rounds at least every 7 days and provide out-of-cell time. If an inmate in segregation for more than 60 days refuses out-of-cell time, a mental-health professional must evaluate the inmate to determine the risk of deteriorating mental health. *Id.* at 923–24.

**(4) Medication.** Inmates prescribed psychotropic medication must be "evaluated by a psychiatric provider at regular intervals consistent with constitutional standards." *Id.* at 924. IDOC must administer medications in a manner that provides "reasonable assurance" that the medications are actually delivered. *Id.*; *id.* at 924–25.

**(5) Evaluations and treatment plans.** IDOC must provide all class members an individualized treatment plan that includes long- and short-term objectives and regular reviews with the patient. *Id.* at 925.

## II. Discussion

The defendants challenge the judge's ruling that the shortcomings in IDOC's performance under the settlement agreement amount to an Eighth Amendment violation. They also challenge the scope of the injunction under the terms of the agreement and the PLRA. We review the judge's factual findings for clear error, *ADT Sec. Servs., Inc. v. Lisle–Woodridge Fire Prot. Dist.*, 724 F.3d 854, 863 (7th Cir. 2013),

including his finding of deliberate indifference, *see Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) ("Whether a prison official acted with the requisite state of mind 'is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.'" (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994))). We review a decision to enter a permanent injunction for abuse of discretion, *Stone v. Signode Indus. Grp. LLC*, 943 F.3d 381, 384 (7th Cir. 2019), but a legal error is necessarily an abuse of discretion, *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012).

## A.  Deliberate Indifference

Everyone agrees that each of the plaintiffs suffers from an objectively serious medical condition—here, mental illness—which is the first element of an Eighth Amendment claim premised on inadequate prison healthcare. The parties' dispute centers on whether the IDOC officials were deliberately indifferent to the plaintiffs' medical condition. *Lockett*, 937 F.3d at 1022. Deliberate indifference is a subjective mental state; the official must have actually known of and consciously disregarded a substantial risk of harm. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc). This is a high bar "because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) (quotation marks omitted).

Evidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference. *Farmer*, 511 U.S. at 844; *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002); *see also Sinn v. Lemmon*, 911 F.3d 412, 423–24 (7th Cir. 2018) (holding that no reasonable juror could infer

deliberate indifference where prison officials took sensible steps to address unsafe prison conditions). Similarly, "the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." *Peate*, 294 F.3d at 882.

The defendants maintain that the judge effectively ignored the subjective element. This case obviously involves a claim of systemically inadequate prison healthcare, which the judge referred to as a "second category of deliberate indifference claim[]." *Rasho*, 376 F. Supp. 3d at 914. The defendants read this statement as taking the subjective element off the table; they contend that the judge engaged in a solely objective analysis. We see it differently. The subjective state-of-mind element applies to claims of isolated incidents of indifference *and* pervasive deficiencies in prison medical treatment, and the judge recognized as much. His innocuous reference to a "second category" of claims— language that appears in our own caselaw, *e.g.*, *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 554 (7th Cir. 2016)—merely invoked the well-settled principle that while a single negligent act cannot support an inference of deliberate indifference, persistence in a course of action known to be ineffective can, *see Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662–63 (7th Cir. 2016).

Although the judge recited the correct legal standard, we agree with the defendants that the record does not support his finding of deliberate indifference. To the contrary, the evidence establishes that IDOC made reasonable efforts to cure the deficiencies in the five areas identified in the plaintiffs' claim and to alleviate the staffing shortage. These include increasing the number of psychiatric providers,

authorizing unlimited overtime, paying travel stipends and supercompetitive salaries, and increasing the use of telepsychiatry (among other steps). These actions by IDOC administrators demonstrate a commitment to addressing the problem—the antithesis of the callous disregard required to make out an Eighth Amendment claim. *See, e.g.*, *Rosario*, 670 F.3d at 822 (affirming a grant of summary judgment to officers where their actions were "not perfect" but demonstrated an "overall picture" of "protection and compassion").

To be sure, IDOC's efforts fell short: the prison system has not yet provided the level of care prescribed by the settlement, nor has it hit the personnel targets laid out in its 2014 Remedial Staffing Plan. But that does not equate to a constitutional violation. For one thing, there is no evidence that the terms of the settlement and IDOC's staffing plan matched the constitutional floor, an issue we address below. But even assuming IDOC's goals corresponded to the Eighth Amendment minimums, the defendants cannot have been deliberately indifferent because they undertook reasonable measures to achieve those goals, even though they were ultimately unsuccessful. *Peate*, 294 F.3d at 882.

The judge was wrong to fault the defendants for their "unsustainable" use of overtime, continued reliance on Wexford for staffing, and "lack of a sense of urgency" in complying with the settlement. It is always possible to do more or move faster, but the existence of policies that may have been more effective does not mean an official recklessly disregarded the risk of harm. *Smith v. Sangamon Cnty. Sheriff's Dep't*, 715 F.3d 188, 191 (7th Cir. 2013); *see also Lockett*, 937 F.3d at 1022–25 (explaining that a nurse is not

necessarily liable for an inmate's chronic pain, even if he could have prescribed more powerful opiates); *Rosario*, 670 F.3d at 821–22 (holding that an officer is not liable for an arrestee's suicide, even if he could have done more to prevent the arrestee's access to a razor blade); *Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000) (explaining that a jail is not necessarily liable for a detainee's suicide, even if it could have designed cells differently to decrease the risk of suicide). Prison officials undoubtedly could have done more to address the deficiencies in IDOC's mental-health services, but their failure to pursue additional options does not amount to deliberate indifference. *See Rosario*, 670 F.3d at 821–22 (noting officials may "escape liability even if they did not take perfect action").

Nor is this a case in which the prison officials persisted in taking steps that they knew were insufficient to prevent the harm. *See Petties*, 836 F.3d at 730–31. It was reasonable to expect that paying higher salaries and offering bonuses would attract more mental-health personnel, just as it was reasonable to believe that expanding the use of telepsychiatry and paying travel stipends would enable them to more efficiently deploy their limited resources. Indeed, the record shows that IDOC's multifaceted approach led to reduced backlogs in mental-health treatment and a substantial increase in the number of psychiatric providers—even though its efforts ultimately fell short. Put simply, IDOC officials took multiple reasonable steps to fix the complex problem of understaffing in mental-health services, so they cannot have been deliberately indifferent. It was error to find otherwise.

**B. Scope of Injunction**

The PLRA constrains a court's authority to enter an injunction with respect to prison conditions: "The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." § 3626(a)(1)(A). The Supreme Court has repeatedly emphasized that prison administrators have substantial discretion over the institutions they manage. *See, e.g.*, *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 326 (2012). We have done the same. *See, e.g.*, *Mays v. Dart*, 974 F.3d 810, 820–21 (7th Cir. 2020). This principle is embodied in the PLRA's limit on remedies. *Westefer*, 682 F.3d at 683.

Our decision in *Westefer* illustrates how § 3626(a)(1)(A) works in practice. After a group of inmates brought a due-process challenge to the procedure IDOC used to transfer prisoners to supermax facilities, IDOC voluntarily submitted to the court a "Ten–Point Plan" proposing revisions to the transfer process. *Id.* at 682. The district court used the Plan as a model for its remedial order, "incorporating it almost wholesale into a detailed 16–point injunction." *Id.* Notably, just a few years before, the Supreme Court had upheld a scheme similar to the Ten–Point Plan against a due-process claim. *Id.* at 683 (citing *Wilkinson v. Austin*, 545 U.S. 209, 230 (2005)). Among other things, the injunction required IDOC to provide 48-hour notice before a transfer hearing and to hold a hearing within 10 or 30 days of transfer (depending on the type of transferee). *Id.* at 682–83.

We held that the injunction went well beyond the limits imposed by the PLRA, explaining that the judge had "mistakenly conflated what is constitutionally *adequate* to satisfy due process with what is constitutionally *required*." *Id.* at 683–84. While the Supreme Court had held that a 24-hour prehearing notice is constitutionally required, the injunction violated the PLRA's narrow-tailoring requirement in mandating 48-hour notice. *Id.* at 684. Likewise, setting a specific 10- or 30-day window for transfer hearings exceeded the constitutionally required "reasonable time" for such a hearing and in doing so defied the PLRA's least-intrusive-means prong. *Id.* at 684–85. It did not matter that the injunction included "hedging 'whenever possible' language" in its mandate; the PLRA requires that courts give prison administrators wide latitude to set constitutionally adequate procedures. *Id.* at 685. We summarized:

> In short, the injunction goes well beyond what the Supreme Court has said is constitutionally required. By incorporating a highly specific notice-and-hearing system into the injunction, the district court has in effect established the details of that system as constitutional requirements. This is not the narrow tailoring that the PLRA requires. It is up to IDOC to craft transfer-review procedures that meet the requirements of due process. The court should do no more than to order IDOC officials to do so in general terms and to verify that the plan they submit satisfies the relevant constitutional standards.

*Id.* at 686.

The injunction here suffers from the same infirmities as the one we vacated in *Westefer*. Most egregiously, the judge ordered IDOC to hire and maintain precise numbers and types of personnel: "7 Site Mental Health Service Directors; 12 Mental Health Unit Directors; [16] Staff Psychologists; 142.5 Qualified Mental Health Professionals; 102 Behavioral Health Technicians; 54.5 Registered Nurses—Mental Health; 24 Staff Assistants; 85.5 Psychiatric Providers; 1 Director of Nursing—Psychiatric; [and] 5 Recreational Therapists." This degree of specificity contravenes the PLRA's least-intrusive-means requirement. Could IDOC have provided constitutionally adequate care with 85 Psychiatric Providers instead of 85.5? What about using 103 Behavioral Health Technicians but only 22 Staff Assistants? Could IDOC continue to authorize unlimited overtime and expanded telepsychiatry—practices that had a proven effect of reducing treatment backlogs? There is no evidence in the record establishing that these specific numbers correspond to the constitutional floor, yet the PLRA demands that injunctive relief "extend no further" than necessary to remedy the constitutional violation. By exceeding that limitation, the judge's order impermissibly strips IDOC officials of the flexibility necessary to adopt and implement policies that balance prison resources, safety concerns, and inmate health.

The judge's error goes beyond staffing too. The injunction requires, for example, that class members in segregation for 16 days or more be examined by mental-health staff at least every 7 days. That may be a valuable way of preventing the deterioration of a segregated inmate's mental health, but the Eighth Amendment does not require the most effective solution. *Rosario*, 670 F.3d at 822; *see also Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015) (holding that an injunction

requiring air conditioning to decrease prison cell tempera-
ture violated the PLRA because the "plaintiffs are not enti-
tled to the most effective available remedy; they are entitled
to a remedy that eliminates the constitutional injury" (citing
*Westefer*, 682 F.3d at 683–84)). As in *Westefer*, the judge
"mistakenly conflated what is constitutionally *adequate* …
with what is constitutionally *required*" and in doing so
overstepped the bounds of the PLRA. 682 F.3d at 683–84.

The judge held that *Westefer* is inapplicable for two rea-
sons. First, he noted that "the record here demonstrates a
long history of the [d]efendants' non-compliance with
various terms they had agreed upon." *Rasho*, 376 F. Supp. 3d
at 918. The judge did not explain why he thought that the
history of noncompliance mattered. It doesn't; or more
precisely, it doesn't make *Westefer* inapplicable or dilute the
PLRA's remedial limitations. The PLRA applies of its own
force and in full since the case involves "prison conditions,"
§ 3626(a)(1)(A), and by dint of its inclusion in the settle-
ment's remedial limits.

Second, the judge stated that the "[d]efendants' proposal
is wholly deficient in addressing their constitutional viola-
tions." *Rasho*, 376 F. Supp. 3d at 918. The defendants' pro-
posal, however, would have required them to remedy the
alleged violation "in general terms" in accordance with our
instructions in *Westefer*, 682 F.3d at 686. And even if the
proposal had been lacking, the judge was not free to go
beyond the limits imposed by the PLRA in crafting an
injunction.

We do not mean to say that an injunction imposing a
specific numeric target automatically violates the PLRA. In
*Brown v. Plata*, 563 U.S. 493, 538–41 (2011), the Supreme

Court held that an order requiring California to reduce its prison population to 137.5% of the prison facilities' design capacity satisfied the PLRA's narrow-tailoring requirement. Critically, however, the district court heard from multiple expert witnesses who testified that a 130% limit "was necessary to remedy the constitutional violations" and then adjusted that metric upward "in light of the caution and restraint required by the PLRA." *Id.* at 540 (quotation marks omitted). Moreover, the order did not require "achiev[ing] this reduction in any particular manner" but rather "ordered the State to formulate a plan for compliance and submit its plan for approval by the court." *Id.* at 510. Doing so gave California "substantial flexibility" to reach its goal. *Id.* at 532.

In contrast to *Brown*, here the judge imposed specific benchmarks lifted from the settlement and IDOC's 2014 Remedial Staffing Plan without evidence that those plans matched the constitutional floor. In fact, the Staffing Plan explicitly stated that it set staffing at levels sufficient to *exceed* the constitutional minimum. Nor did the judge impose staffing targets "in a manner that [left] much to [IDOC's] discretion," *id.* at 533; instead, he prescribed the exact numbers, types, and duties of IDOC personnel. That can hardly be the least intrusive means of correcting a constitutional violation.

### III. Conclusion

IDOC officials took multiple reasonable steps to cure the staffing shortage and improve mental-health services in the five areas at issue in this claim. Those actions demonstrate due regard for the harms imposed by inadequate mental-health care, so the judge's finding of deliberate indifference was error. In addition, and as an independent reversible

error, the scope of the injunction exceeded the bounds set by the PLRA. Accordingly, we REVERSE the district court's order and VACATE the permanent injunction in its entirety.

RIPPLE, *Circuit Judge*, dissenting. For more than a decade, Ashoor Rasho, as representative of a class of mentally ill Illinois prisoners, has been litigating the deficiencies of the Illinois Department of Corrections ("IDOC") in the delivery of mental health care to its inmate population. Although the parties reached a comprehensive, court-approved settlement agreement in May 2016 that called for increased staffing, improved processes, and updated facilities across service areas, IDOC was slow to implement changes. The monitor repeatedly reported the core problem: an overwhelming shortage of staff. It was not until IDOC was faced with the threat of court-enforced remedies that it acted with any seriousness or promptness. The district court found, however, that these eleventh-hour efforts were motivated at least in part by the threat of court intervention, that they were not sustainable, and that IDOC administrators knew that they were not sustainable. After considering the record as a whole, the district court concluded that "systemic and gross deficiencies in staffing" had resulted in the denial of "access to adequate and constitutionally required care" that violated the Eighth Amendment.[1] These findings were not clearly erroneous. Moreover, the district court's permanent injunction was limited to curing the constitutional violation and was no broader than necessary to achieve this purpose. I therefore respectfully dissent.

---

[1] R.2460 at 41 (quoting *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983)).

## I

Because deliberate indifference is a factual determination,[2] I set forth in some detail the facts leading to the district court's permanent injunction order.

In response to Mr. Rasho's complaint alleging constitutional violations in the delivery of mental health services, the parties entered a comprehensive settlement agreement ("Agreement") in May 2016. The Agreement addressed numerous areas where IDOC had been deficient including: the quality and timing of initial intakes; the development and revision of treatment plans; treatment space; staffing; confidentiality; and the housing and discipline of seriously mentally ill inmates. The Agreement provided for the hiring of a monitor, Dr. Pablo Stewart, to evaluate IDOC's progress, provide updates, and prepare annual reports.

Dr. Stewart submitted his first annual report in May 2017. The report noted the substantial cooperation of the leadership and staff at IDOC but concluded that IDOC still was struggling to meet the requirements of the Agreement. The Executive Summary of the report captures those shortcomings:

> Among IDOC's challenges is the grossly insufficient and extremely poor quality of psychiatric services. This overwhelming shortage and lack of standards undermines all of the efforts of IDOC to meet the first-year requirements of the Settlement. These psychiatric services

---

[2] *See Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (observing that "[w]hether a prison official acted with the requisite state of mind"—deliberate indifference—"is a question of fact subject to demonstration in the usual ways" (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994))).

deficiencies include but are not limited to problems with the proper continuation of medications for offenders entering IDOC, lack of timely follow-up for offenders prescribed psychotropic medication, dangerous practices related to the use of psychotropic medications including those offenders on forced medication, lack of following standard protocols for ascertaining side effects, extreme delays in obtaining psychiatric evaluations, non-participation of psychiatrists in the treatment planning process, lack of timely psychiatric follow up for offenders assigned to crisis beds, and problems related to those offenders designated as requiring inpatient level of psychiatric services. Of note, the overall quality of the psychiatric services provided to the mentally ill offenders of IDOC is exceedingly poor and often times dangerous. IDOC leadership is well aware of the problems related to the insufficient amount of psychiatric services and has taken decisive action to address this issue, but this has not yet been effective. At the time of the submission of this report, however, the lack and quality of psychiatric services negatively impacts all aspects of the Settlement and contributes to IDOC being non-compliant in the vast majority of areas of the Settlement.[3]

---

[3] R.1373 at 10.

As my colleagues note, Dr. Stewart's concerns persisted over the next several months. In October 2017, these concerns led him to write to Dr. Melvin Hinton, IDOC's Chief of Mental Health, that IDOC was "in a state of emergency."[4] In the same letter, Dr. Stewart addressed IDOC's increased use of telepsychiatry to solve the mental health crises. Dr. Stewart explained that telepsychiatry was not authorized for use in a number of areas: for "initiating treatment," for "evaluating patients in crisis," or for treating patients with some physical and cognitive impairments.[5] Moreover, although telepsychiatry could be one tool in the "overall solution, it [wa]s not the solution in and of itself. Any solution to this emergency necessarily involve[d] the hiring of additional psychiatrists, psychiatric nurse practitioners and/or primary care physicians."[6]

IDOC's continued failures in the areas identified by Dr. Stewart led the plaintiffs to file a motion to compel compliance with the Agreement. They later amended this motion to include a request for a preliminary injunction. The district court heard testimony on the plaintiffs' motion for six days in late 2017 and early 2018. The evidence showed that IDOC had spent $45 million to build new residential treatment units at several facilities and $75 million to develop a new data system for intake assessments. It also had procured another $150 million to construct a new inpatient facility. Finally, it had provided mental health training to its entire staff and had hired administrative personnel to coordinate inmate care.

---

[4] R.1559-2 at 3.

[5] *Id.*

[6] *Id.*

However, IDOC still was falling short in the provision of mental health services due, in large part, to staffing shortages. For instance, Dr. Hinton testified that IDOC employed less than half of its budgeted number of psychiatrists. Indeed, "almost all of the medical doctors at the hearing clearly stated, in one form or another, [that] the system in place to treat mentally ill inmates at the IDOC is in a state of emergency."[7] Crediting this testimony, the court concluded that IDOC was "unable to provide the constitutionally required care."[8] The court therefore entered a preliminary injunction. Although it detailed the areas that IDOC needed to address, it did not set specific, numeric goals that IDOC had to meet. Instead, it instructed that "[w]ithin 90 days of this order, Defendants shall provide sufficient staff to address constitutional violations in the five areas identified in this order": medication, evaluations, treatment plans, segregation, and crisis treatment.[9]

Dr. Stewart's Second Annual Report, filed in June 2018, continued to sound the alarm regarding staffing levels. The report first noted that the remedial targets set forth in May 2016 were "not sufficient to meet the requirements of the Settlement Agreement."[10] Moreover, IDOC had "never met its staffing goals through the life of the Settlement Agreement."[11]

---

[7] R.2070 at 13.

[8] *Id*. at 20.

[9] *Id.* at 40.

[10] R.2122 at 34.

[11] *Id.*

Shortly thereafter, the plaintiffs moved for a permanent injunction. The court conducted a second evidentiary hearing, in which it again heard testimony from numerous witnesses. IDOC presented evidence of substantial expenditures on residential treatment units at several locations; an increase in administrative staff to coordinate services; an increase in training provided to staff; and new operating procedures and administrative directives. The evidence also showed that, between January 2018 and the permanent injunction hearing, the Department had increased staffing for mental health from 33.53 to 50.55 full time equivalent providers and had increased by six the number of qualified mental health professionals.

Nevertheless, the record contained evidence that lack of staff continued to pose a serious problem. Specifically, when asked whether the current staffing levels were adequate to meet the needs of inmates, Dr. Hinton would not directly answer the question.[12] There were efforts to shift staff "from one area of concern to another" in order to establish that IDOC was meeting the residents' needs.[13] There also was testimony from IDOC psychiatrists that, although there had been reductions in backlogs, these were due in large part to the use of overtime, which not only "would be difficult to sustain," but created another "problem"—loss of good staff due to burnout.[14]

---

[12] *See* R.2372 at 47.

[13] R.2460 at 27.

[14] *Id.* at 23 (quoting R.2376 at 356, 1433–34).

The district court granted the plaintiffs' motion for a permanent injunction. Before addressing IDOC's deficiencies in the specific areas at issue, the court emphasized that its finding was "based generally on the fact that there [wa]s insufficient mental health staffing at … IDOC."[15] Although it acknowledged that IDOC had made some improvements, the court found that the use of unlimited overtime was "unsustainable,"[16] and that IDOC's "efforts ha[d] been generally ineffective—and ha[d] gone on far too long without any significant attempt to adapt or modify based on the knowledge gained from their recruiting efforts."[17] More importantly,

> [e]ven with the additional mental health staff hired after the preliminary injunction hearing, the numbers associated with mental health providers [we]re deficient to provide the constitutionally required care. In fact, the June 2018 monthly facility performance report showed Wexford had failed to supply more than 10,000 hours of required clinical staff for that month.[18]

The court further found that IDOC had been aware of these deficiencies "for an unreasonable period of time, and their failure to address these deficiencies amount[ed] to deliberate indifference."[19] "While some efforts ha[d] been

---

[15] R.2460 at 17.

[16] *Id*.

[17] *Id*. at 27.

[18] *Id.* at 20.

[19] *Id*. at 27.

successful, including the recent expansion of the use of tele-psychiatry, the Defendants ha[d] failed to achieve a minimum level of medical service to avoid the label of cruel and unusual punishment."[20]

After reviewing the evidence, the court set forth the requirements for establishing an Eighth Amendment violation: "(1) the plaintiff 'suffered an objectively serious harm that presented a substantial risk to his safety,' and (2) 'the defendants were deliberately indifferent to that risk.'"[21] Because there was no doubt that the prisoners had presented evidence of an objectively serious risk of harm, the court turned to the subjective component:

> The subjective component requires a plaintiff to "provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) … . In order to establish deliberate indifference, "a plaintiff does not need to show that the official intended harm or believed that harm would occur." *Id*. … However, medical malpractice, negligence, or even gross negligence do not equate to deliberate indifference. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) … .
>
> The Seventh Circuit has recognized claims of systemic deficiencies in a prison's health care facility as a second category of deliberate

---

[20] *Id.* at 27–28.

[21] *Id.* at 39 (quoting *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010)).

indifference claims. *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 430–31 (7th Cir. 1989). In case of alleged systemic deficiencies, deliberate indifference can be demonstrated by "proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Wellman*, 715 F.2d. at 272 … . The Seventh Circuit has concluded "that a clear consensus had been reached indicating that a prison official's failure to remedy systemic deficiencies in medical services akin to those alleged in the present case constituted deliberate indifference to an inmate's medical needs." *Cleveland-Perdue*, 881 F.2d at 431.[22]

Although the record did show that IDOC had "recently made efforts to address many of the problems associated with the delivery of adequate mental health care," the court "remain[ed] concerned with the overall lack of sense of urgency."[23] The problems, the court continued, dated "as far back as 2014 when the Defendants created their own remedial plan," but they had yet "to fulfill any of their own staffing requirements."[24] They also had yet to meet many of the terms of the Agreement. As a result, "[i]t [wa]s clear [that] mentally ill inmates continue[d] to suffer as they wait[ed] for the IDOC

---

[22] *Id.* at 41.

[23] *Id.* at 43–44.

[24] *Id.*

to do what they said they would do."[25] Consequently, the district court concluded that IDOC "knew of, and disregarded, a substantial risk of harm to the Plaintiffs."[26]

After soliciting IDOC's input regarding how to address the constitutional deficiency, the district court ultimately concluded that IDOC's 2014 proposed staffing plan[27] provided a sound basis for injunctive relief. Thus, the district court required that IDOC reach the staffing levels that, back in 2014, *IDOC itself* had acknowledged were necessary. While this step would not solve entirely the present violation, it would at least require that IDOC make some forward progress toward meeting minimal staffing requirements.

## II

I now turn to the majority's review of the district court's finding of deliberate indifference. The majority initially observes the "high bar" set by the deliberate indifference standard, which "'requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" Majority Op. 10 (citing *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)). Thus, evidence that "the defendant responded *reasonably* to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference." *Id*. (emphasis added). The majority acknowledges that the district court's finding that this

---

[25] *Id*.

[26] *Id*.

[27] "IDOC Proposed Remedial Plan" dated April 17, 2014 ("2014 Remedial Staffing Plan"), was entered as an exhibit during the hearing on the preliminary injunction. *See* R.1716, Exhibit and Witness List, Ex. 9.

standard has been met is a factual one subject only to clear error review. *See id.*[28]

My colleagues believe, however, that the record cannot support a finding of deliberate indifference. While "IDOC's efforts fell short" achieving the 2014 staffing levels, "that d[id] not equate to a constitutional violation." *Id*. at 12. Even assuming that the 2014 staffing levels represented the "constitutional floor," the majority continues, IDOC could not "have been deliberately indifferent because [it] took reasonable measures to achieve those goals, even though they were ultimately unsuccessful." *Id*. (citing *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002)). "It is always possible to do more or move faster," it states, "but the existence of policies that may have been more effective does not mean an official recklessly disregarded the risk of harm." *Id*. at 12.

Respectfully, this conclusion both misreads the record and fails to give sufficient deference to the district court's factual findings. First, the district court did not rely solely on the staffing numbers in the 2014 remedial plan or the Agreement to establish a constitutional violation. Rather, the district court relied on the testimony at the preliminary injunction hearing that, despite the passage of significant time, IDOC did not have the staffing necessary to provide psychiatric care to all of the patients in its system and that prisoners were not getting the care they needed.[29] Moreover, despite some improvements made after the preliminary injunction order

---

[28] Notably, my colleagues explicitly reject IDOC's argument that the district court applied an incorrect legal standard. *See* Majority Op. 11.

[29] *See* R.2460 at 15–16.

issued, the care still was "constitutionally deficient."[30] "In fact, the June 2018 monthly facility performance report showed Wexford had failed to supply more than 10,000 hours of required clinical staff for that month."[31] Thus, the district court did not simply look to target numbers; it looked instead at the care that existing staff was providing and concluded that the lack of staff was jeopardizing the welfare of the inmates.

The district court relied on relevant and probative evidence in concluding IDOC officials were deliberately indifferent. In *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983), we addressed whether certain deficiencies in a prison's provision of healthcare violated the Eighth Amendment. We explained:

> As a practical matter, "deliberate indifference" can be evidenced by "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff" or it can be demonstrated by "proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care."

*Id.* (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)); *cf. Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 663 (7th Cir. 2016) (noting that "evidence sufficient to create a jury question might include the obviousness of the risk from a

---

[30] *Id.* at 17.

[31] *Id.* at 20.

particular course of medical treatment [and] the defendant's persistence in 'a course of treatment known to be ineffective'" (internal citations omitted)). Thus, prison officials' knowledge of ongoing deficiencies that seriously affect inmates' health bears directly on whether the deliberate indifference standard has been met. The same is true of prison officials' knowledge that certain "remedial" actions will not ameliorate the constitutional violation.

Here, a district court, which had overseen the litigation for more than a decade, conducted a comprehensive hearing prior to the preliminary injunction and another hearing prior to entry of the permanent injunction. It made specific credibility findings with respect to the administrators and the mental health professionals testifying on behalf of IDOC. It pointed to specific testimony that demonstrated that these officials knew that the new measures were not capable of meeting the needs of the inmates, that they were not sustainable in the long term, and that they would not cure effectively the constitutional violations. *See* R.2460 at 19 (Dr. Hinton evading the question whether IDOC's staffing levels were "adequate"); *id.* at 23 (Psychologist Administrator at Pontiac acknowledging that reduction in backlog was being effected through "people com[ing] from other institutions … and … additional overtime" which would be "difficult to sustain"); *id.* at 27 ("This colloquy between Plaintiffs' counsel and Dr. Sim demonstrates the ongoing shift by the Defendants of their limited staff resources from one area of concern to another and the need to cover essential items by use of overtime. This is simply unsustainable.").

Nevertheless, the majority concludes that IDOC officials "cannot have been deliberately indifferent" because they

"took multiple reasonable steps to fix the complex problem of understaffing in mental-health services." Majority Op. 13. This conclusion only can be reached by evaluating the reasonableness of IDOC's actions in a temporal vacuum. Here, the district court legitimately—and correctly—evaluated IDOC's actions in the context of what had come before: more than a decade of failing to address seriously the constitutionally deficient mental health care provided to inmates. The district court also understood what would come after: loss of staff and services due to the inability to sustain the financial and human resource burden of overtime requirements. When IDOC's actions are viewed through this lens—as the district court certainly was entitled to do—they were not reasonable. The district court concluded that IDOC had been recalcitrant in addressing systemic problems in staffing until entry of the preliminary injunction. *See* R.2460 at 27 ("There have undoubtedly been efforts on the part of the Defendants to address the staffing needs regarding mental health; however, these efforts have been generally ineffective—and have gone on far too long without any significant attempt to adapt or modify based on the knowledge gained from their recruitment efforts."). Once the preliminary injunction was entered, there was a surge of activity, but IDOC officials *knew* their actions would not solve IDOC's staffing issues, nor ensure the delivery of constitutionally adequate care.

"Clear error is a deferential standard of review that only merits reversal if 'after reviewing the entire record, we are left with the firm and definite conviction that a mistake has been made.'" *LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 946 (7th Cir. 2019) (quoting *United States v. Rangel*, 872 F.3d 815, 818 (7th Cir. 2017)). When IDOC's recent "improvements" in the delivery of services are evaluated according to the entire

record, the district court's conclusion that the IDOC officials were deliberately indifferent is a sound one. It certainly does not leave one with a "firm and definite conviction that a mistake has been made."

## III

The panel majority's review of the scope of the district court's injunction also is cause for significant concern. Its parsimonious attention to the statute's language and to the significant consensus of judicial decisions interpreting that language sets our circuit on a lonely course. This solitary path now before us puts us in conflict with the controlling precedent of the Supreme Court and with the decisions of the other circuits. It also will create needless ambiguity and frustration for the district judges of our circuit who will have the unenviable task of following its approach in future cases.

### A.

The PLRA provides in relevant part:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626 (a)(1)(A).[32] As spelled out in the statutory language, these requirements are to be read in harmony with the traditional limitations on the equitable powers of the federal courts: "Nothing in this section shall be construed … to repeal or detract from otherwise applicable limitations on the remedial powers of the courts." 18 U.S.C. § 3626(a)(1)(C). Consequently, "the limitations on injunctive relief imposed by … traditional equity practice remain in force in cases governed by the PLRA. The PLRA only adds to the preexisting limits on injunctive relief; it does not subtract from them." *Ga. Advoc. Off. v. Jackson*, 4 F.4th 1200, 1209 (11th Cir. 2021). Traditional principles for granting federal equitable relief therefore also inform our understanding of the PLRA. A core traditional principle is that a court's task in fashioning equitable relief "is to correct … the condition that offends the Constitution"; "the scope of the remedy is determined by the nature and extent of the constitutional violation." *Milliken v. Bradley*, 418 U.S. 717, 738, 744 (1974) (internal quotation marks omitted). In the words of one of our sister circuits, "the PLRA supercharges" this traditional equitable principle:

> While courts were already required to ensure injunctions are no broader than necessary, the PLRA emphasizes the importance of narrow tailoring in prison litigation by requiring courts to make specific findings that "such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct

---

[32] Courts frequently refer to this section as creating a "need-narrowness-intrusiveness" standard.

>    the    violation    of    the    Federal    right."
>    § 3626(a)(1)(A).

*Ga. Advoc. Off.*, 4 F.4th at 1209.

Although the PLRA undoubtedly sets a high bar, its stand-
ards are not designed for application in the abstract world of
appellate chambers but in the real-world courtroom of the
practicing district judge dealing with very important human
problems and very real parties. We cannot attribute to Con-
gress the intent to create a practically unworkable standard
designed to frustrate the conscientious district court in the
performance of its already difficult duty. Indeed, the Supreme
Court has instructed that "[t]he PLRA should not be inter-
preted to place undue restrictions on the authority of federal
courts to fashion practical remedies when confronted with
complex and intractable constitutional violations." *Brown v.
Plata*, 563 U.S. 493, 526 (2011). Instead, "[c]ourts should pre-
sume that Congress was sensitive to the real-world problems
faced by those who would remedy constitutional violations in
the prisons and that Congress did not leave prisoners without
a remedy for violations of their constitutional rights." *Id.*

## B.

### 1.

In assessing the district court's decision, the panel major-
ity takes as its centerpiece our decision in *Westefer v. Neal*, 682
F.3d 679 (7th Cir. 2012). In doing so, it asks that solid decision
to carry weight that it was not designed to, and ought not be
required to, bear. *Westefer* involved a prisoners' due process
challenge to the method employed to assign them to a maxi-
mum-security facility. After a bench trial, the district court
concluded that the procedures violated the prisoners' rights

to due process. While the litigation was ongoing, IDOC had reviewed its procedures and had submitted to the district court a proposed ten-point plan for revisions. The district court then employed IDOC's plan as the framework for its remedial order.

IDOC challenged the order on appeal, and we reversed. We explained that the district court had "mistakenly conflated what is constitutionally adequate to satisfy due process with what is constitutionally required." *Id*. at 683–84. The plan, we continued, went far beyond the constitutional requirements of "informal, nonadversarial due process" and therefore could not "be reconciled with the PLRA's requirement that injunctions in prison-conditions cases must be narrowly drawn and use the least intrusive means of correcting the violation of the federal right." *Id*. at 684. We concluded:

> By incorporating a highly specific notice-and-hearing system into the injunction, the district court has in effect established the details of that system as constitutional requirements. This is not the narrow tailoring that the PLRA requires. It is up to IDOC to craft transfer-review procedures that meet the requirements of due process. The court should do no more than to order IDOC officials to do so in general terms and to verify that the plan they submit satisfies the relevant constitutional standards.

*Id*. at 686.

*Westefer* is a thoughtful, straightforward application of the core principle of equity practice in constitutional cases, "supercharge[d]" by the PLRA, *Ga. Advoc. Off.*, 4 F.4th at 1209,

that a federal court's injunction should address only "the condition that offends the Constitution," *Milliken*, 418 U.S. at 738. In *Westefer*, the district court attempted to restrict the reach of its injunctive relief by basing it on IDOC's own submission. The court nevertheless erred by requiring a remedy that implemented far more than required by the Constitution.

In the present case, the district court considered the *Westefer* decision, but did not believe that case governed the situation before it for two reasons: "First, the record here demonstrates a long history of the Defendants' non-compliance with various terms they had agreed upon. Second, given this history of non-compliance, Defendants' proposal is wholly deficient in addressing their constitutional violations."[33] The panel majority faults the district court for this conclusion; in its view, IDOC's history of noncompliance is not a relevant consideration here. *See* Majority Op. 17 ("The judge did not explain why he thought that the history of non-compliance mattered. It doesn't; or more precisely, it doesn't make *Westefer* inapplicable or dilute the PLRA's remedial limitations."). Respectfully, the precedent of the Supreme Court and of the other circuits counsels otherwise.

Of key importance is the Supreme Court's decision in *Brown v. Plata*, 563 U.S. 493 (2011). *Plata* involved consolidated cases instituted by prisoners in California challenging various aspects of their confinement. There was no question that the constitutional violations were, in large part, rooted in overcrowding, and the courts in both cases had taken a number of

---

[33] R.2516 at 3.

preliminary, remedial steps in an attempt to eliminate the constitutional violations. As recounted by the Court,

> [a]lthough both the revised plan of action in *Coleman* and the appointment of the Receiver in *Plata* were new developments in the courts' remedial efforts, the basic plan to solve the crisis through construction, hiring, and procedural reforms remained unchanged. These efforts had been ongoing for years; the failed consent decree in *Plata* had called for implementation of new procedures and hiring of additional staff; and the *Coleman* Special Master had issued over 70 orders directed at achieving a remedy through construction, hiring, and procedural reforms. The *Coleman* Special Master and *Plata* Receiver were unable to provide assurance that further, substantially similar efforts would yield success absent a population reduction. Instead, the *Coleman* Special Master explained that "many of the clinical advances ... painfully accomplished over the past decade are slip-sliding away" as a result of overcrowding. And the *Plata* Receiver indicated that, absent a reduction in overcrowding, a successful remedial effort could "all but bankrupt" the State of California.

*Plata*, 563 U.S. at 515–16 (citation omitted).

The cases were consolidated and submitted to the same three-judge panel for a determination of whether a reduction in prison population should be ordered. After a fourteen-day hearing, the panel issued a lengthy opinion, with extensive findings of fact, in which it "ordered California to reduce its

prison population to 137.5% of the prisons' design capacity within two years." *Id.* at 509–10.

On review, the Supreme Court first had to determine whether a three-judge panel had been properly convened. The State asserted, among other arguments, that its "later remedial efforts should have been given more time to succeed," and consequently, it had not been given "a reasonable amount of time to comply with the previous orders" as required by § 3626(a)(3)(A)(ii). *Id.* at 515. The Court rejected this argument, detailing the State's failed actions and explaining:

> Having engaged in remedial efforts for 5 years in *Plata* and 12 in *Coleman*, the District Courts were not required to wait to see whether their more recent efforts would yield equal disappointment. When a court attempts to remedy an entrenched constitutional violation through reform of a complex institution, such as this statewide prison system, it may be necessary in the ordinary course to issue multiple orders directing and adjusting ongoing remedial efforts. Each new order must be given a reasonable time to succeed, *but reasonableness must be assessed in light of the entire history of the court's remedial efforts. ….*

> … A report filed by the Coleman Special Master in July 2009 describes ongoing violations, including an "absence of timely access to appropriate levels of care at every point in the system." A report filed by the Plata Receiver in October 2010 likewise describes ongoing deficiencies in the provision of medical care and

> concludes that there are simply "too many pris-
> oners for the healthcare infrastructure." The
> *Coleman* and *Plata* courts acted reasonably when
> they convened a three-judge court without fur-
> ther delay.

*Plata*, 563 U.S. at 516 (emphasis added) (citations omitted).

The Court was equally practical in assessing whether the order was "narrowly drawn." The Court explained that "[w]hen a court is imposing a population limit, this means the court must set the limit at the highest population consistent with an efficacious remedy." *Id*. at 539. The Court then re-counted the expert testimony explaining the rationale for how much the population should be reduced and concluded that

> [t]here [we]re … no scientific tools available to
> determine the precise population reduction nec-
> essary to remedy a constitutional violation of
> this sort. The three-judge court made the most
> precise determination it could in light of the rec-
> ord before it. The PLRA's narrow tailoring re-
> quirement is satisfied so long as these equitable,
> remedial judgments are made with the objective
> of releasing the fewest possible prisoners *con-*
> *sistent with an efficacious remedy.*

*Id*. at 541 (emphasis added).

*Plata* therefore establishes that, even when acting within the constraints of the PLRA, a district court's approach to fashioning a remedy may be informed by the history of both the constitutional violation and of the failed efforts to solve the problem through other means. Additionally, in choosing

among possible remedial options, the district court's choice need not meet standards of scientific precision.

Cases from other circuits also make clear that the PLRA allows district courts to consider not only the nature of the constitutional violation but also the recalcitrance of the institutional defendant when evaluating the scope of the injunction. *Benjamin v. Fraser*, for instance, involved the conditions under which pretrial detainees were held in the city jails of New York. *Benjamin v. Fraser*, 343 F.3d 35 (2d Cir. 2003), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009). The parties had entered into a consent decree which included creation of an agency to monitor jail conditions. Twenty-one years later, the City defendants moved to terminate the decree. In response the district court terminated some parts of the decree but kept others in place. On appeal, the Second Circuit reviewed each aspect of the injunction; its discussion regarding unconstitutional sanitation conditions at the jails is particularly instructive:

> The district court found, and the City does not contest, unconstitutionally unsanitary conditions in various areas of the facilities. As one remedy, the court ordered that all showers be power washed with bleach quarterly. The City contends that this requirement will damage its newly renovated grouted-tile showers. It also contends that other remedial directives, such as the requirement that showers be "thoroughly cleaned and sanitized at least once daily," are sufficient to keep the showers in sanitary condition.

>   But, as the City acknowledges, since 1995 the
>   DOC's own internal policies have required that
>   showers be washed daily with sanitizing solu-
>   tion, and, as the district court observed, there is
>   no evidence that this cleaning regimen "is equal
>   to the task." We, therefore, find no error in the
>   court's conclusion *that stronger remedial measures*
>   *were necessary and affirm the power-washing re-*
>   *quirement*.

*Id*. at 55 (emphasis added) (citations omitted).

Ineffectiveness and recalcitrance also played a role in the First Circuit's decision to uphold an injunction in *Morales Feliciano v. Rullan*, 378 F.3d 42 (1st Cir. 2004). *Morales Feliciano* concerned the long-term and ongoing failures of the Puerto Rican prison system regarding delivery of healthcare to its inmate population. In 1998, the district court entered prospective injunctive relief that included "the proposed privatization of medical and mental health care throughout the correctional system." *Id*. at 45. Five years later, the Commonwealth sought to vacate or terminate the injunction on the grounds (among others) that the district court had failed to make the necessary findings under the PLRA. The district court denied relief, and the First Circuit affirmed.

The First Circuit observed that the PLRA mandates the termination of consent decrees unless the district court makes specific findings, including finding that there is an ongoing constitutional violation, as well as finding that the order "satisfies the statutory narrowness-need-intrusiveness criteria." *Id*. at 54. The court explained that "[t]he application of those criteria is case-specific and must be undertaken in light of both the magnitude of existing constitutional violations and

the available remedial alternatives." *Id*. In the case before it, the court continued,

> [t]he constitutional violations … [we]re substantial in both scope and degree. They have defied correction for more than two decades. The district court has tried more conventional measures, but found them wanting. It has afforded the Commonwealth ample opportunity to bring preexisting mechanisms up to speed or otherwise to correct the phalanx of problems. It has witnessed the Commonwealth's continued inability to cure the constitutional infirmities plaguing the delivery of health care in the correctional system. *This record of abject failure matters in the narrowness-need-intrusiveness inquiry.*

*Id*. at 54–55 (emphasis added) (citing *Benjamin*, 343 F.3d at 49). With respect to the healthcare of inmates, "the level of improvement still f[ell] well short of bringing serious violations into constitutional compliance." *Id*. at 55. "In light of these facts," the court had "no difficulty affirming the district court's finding that a need for ongoing injunctive relief exist[ed]." *Id*.

As to whether the relief was broader than necessary, the court noted that, "*if this were the district court's first attempt at remediation*," it likely would agree with the Commonwealth that the remedy was overbroad. *Id*. (emphasis added). However, the district court had "attempted narrower, less intrusive alternatives," but those had failed.

> For this reason, a more innovative remedy [wa]s justifiable. The increased intrusiveness and

> broader scope of the privatization remedy is a
> direct response to the unique need created by
> the Commonwealth's own failure—for more
> than twenty years—to correct serious constitu-
> tional inadequacies. Drastic times call for dras-
> tic measures.

*Id*.

The Ninth Circuit relied explicitly on *Morales Feliciano* in upholding a district court's remedial order in *Armstrong v. Brown*, 768 F.3d 975 (9th Cir. 2014). Disabled prisoners in the California system filed the action in 1994, at which time the district court concluded that the State was in violation of the Americans with Disabilities Act and the Rehabilitation Act. In response, the State produced a remedial plan intended to en-sure that disabled inmates had access to programs and facili-ties in California's prisons. In March 2001, the district court entered a permanent injunction directing enforcement of the remedial plan. However, by 2007, "the State had failed to bring its correctional facilities into compliance with the reme-dial plan and the 2001 Injunction." *Id*. at 978. The district court therefore entered a second injunction, which required the de-fendants to "'develop a system for holding wardens and prison medical administrators accountable for compliance with the Armstrong Remedial Plan and the orders of this Court.'" *Id*. This system was to "'track the record of each in-stitution and the conduct of individual staff members who are not complying with these requirements.'" *Id*.

In response to the 2007 injunction, the State issued a de-tailed memo outlining how complaints were to be tracked and investigated. *Id*. In 2012, however, the plaintiffs still believed that the State was not complying with the 2007 Injunction,

and the plaintiffs asked the court to issue an order to show cause why the State should not be held in contempt. The motion was accompanied by evidence that inmates were continuing to be denied access to needed accommodations and that the State had failed to investigate and record numerous alleged violations of the remedial plan. The district court concluded that the 2007 Injunction may not have stated the reporting requirements clearly enough and therefore issued an injunction clarifying the State's obligations, explicitly requiring "that the State investigate and 'track all allegations of non-compliance with the [remedial plan] and the orders of this Court.'" *Id*. at 979.

The State appealed the modified injunction on several grounds, including that it violated the PLRA. In affirming the district court, the Ninth Circuit acknowledged that "the district court gave the State several specific instructions on how to implement its accountability system," but nevertheless concluded that the district court's actions were "appropriate here":

> A court may … provide specific instructions to the State without running afoul of the PLRA. While the injunction here might leave the State less discretion than injunctions typically approved in the PLRA context, *we conclude that the level of intrusiveness is acceptable based on the history and circumstances of the case*.

> Disabled inmates have been litigating to ensure that the State provides them with needed accommodation for over two decades—and yet the State still has a long, long way to go before it meets its obligations to these prisoners. *The*

> *ongoing, intractable nature of this litigation affords the district court considerable discretion in fashioning relief. Relief that might have raised concerns about breadth and intrusiveness in the first instance is acceptable in this context*, because the district court "has attempted narrower, less intrusive alternatives—and those alternatives have failed...."

*Id*. at 985–86 (emphasis added) (quoting *Morales Feliciano*, 378 F.3d at 55). The Ninth Circuit likened the facts before it to those in *Morales Feliciano*; it explained:

> The First Circuit confronted a similar situation in litigation involving Puerto Rico's prison system, where constitutional violations pertaining to the delivery of health care were "substantial in both scope and degree" and had "defied correction for more than two decades." *Id*. at 54. We face the same problem here. As we have previously noted, litigation in this matter has been ongoing for decades and the State has "resisted complying with [its] federal obligations at every turn." Through a series of narrowly drawn, carefully-crafted, and thorough orders, the district judge here, like the district judge overseeing the Puerto Rico prison litigation, "*has tried more conventional methods, but found them wanting*." *See Morales Feliciano*, 378 F.3d at 54. "This record of abject failure matters in the narrowness-need-intrusiveness inquiry." *Id*. at 55. *Because the district court has previously tried to correct the deficiencies in California's prisons' compliance*

> *with the ADA and RA through less intrusive means,*
> *and those attempts have failed, relief prescribing*
> *more specific mechanisms of compliance is appropri-*
> *ate. See id.* at 54–56; *see also Plata*, 131 S. Ct. at
> 1946.

*Id.* at 986 (emphasis added) (additional citations omitted).

The Ninth Circuit observed that "the core PLRA inquiry is 'whether the same vindication of federal rights could have been achieved with less involvement by the court in directing the details of defendants' operations." *Id.* at 986. However, the State's actions over the past twenty years had shown "that the same vindication of federal rights cannot be achieved with less involvement by the district court." *Id.* Moreover, the State had not suggested other, less-intrusive means of ensuring accountability. Given that the State's failure to present a realistic alternative, "its protestations that such alternatives exist [were] hollow." *Id.* Thus, the court concluded that the modified injunction complied with the PLRA.

All of these cases establish that, when addressing constitutional violations that institutional defendants have been slow to correct, district courts may impose increasingly detailed injunctions "to correct the violation of the Federal right." These cases have distinguished—some implicitly, some explicitly—a district court's initial efforts from its later efforts. Moreover, they have identified the key factors in allowing a district court to impose more targeted requirements over time: a continuing constitutional violation that has defied correction, a begrudging (or at least slow) institutional response, and a lack of effort on behalf of the public defendant to propose a viable alternative. Thus, to both the Supreme Court and to our sister circuits, a "history of

noncompliance"[34] does matter, and, indeed, is critical in eval-
uating the scope of the district court's remedial order

Our decision in *Westefer* does not require—or even sug-
gest—a different result. *Westefer* did not address a long-term,
ongoing constitutional violation. In *Westefer*, the district
court's detailed injunction, incorporating the ten-point plan,
represented its first effort to redress the prisoners' claims.
Therefore, when we instructed the district court to "do no
more than to order IDOC officials" to comply with the due
process clause "in general terms and to verify that the plan
they submit satisfies the relevant constitutional standards,"
*Westefer*, 682 F.3d at 686, we were addressing a district court's
first order involving remedial relief. In that context, district
courts must give prison officials considerable leeway in craft-
ing plans to redress constitutional violations. *See id*. at 683
(noting prison officials' "broad administrative and discretion-
ary authority over the institutions they manage" (quoting
*Hewitt v. Helms*, 459 U.S. 460, 467 (1983))). We simply had no
occasion to consider how a history of recalcitrance might alter
the need-narrowness-intrusiveness inquiry.

**2**.

The second crucial shortcoming in the majority opinion is
the lack of recognition that the district court occupies a supe-
rior position in evaluating the critical facts underlying the
need-narrowness-intrusiveness inquiry. Complex and en-
trenched constitutional violations in public institutions do not
lend themselves to simplistic solutions. In *Plata*, for instance,

---

[34] Majority Op. 17.

the Supreme Court noted the difficulty facing the district court in fashioning a remedial order:

> [e]stablishing the population at which the State could begin to provide constitutionally adequate medical and mental health care, and the appropriate timeframe within which to achieve the necessary reduction, requires a degree of judgment. The inquiry involves uncertain predictions regarding the effects of population reductions, as well as difficult determinations regarding the capacity of prison officials to provide adequate care at various population levels.

*Plata*, 563 U.S. at 538.

Given the many variables at issue, other courts have recognized that district courts have an institutional advantage over appellate courts in fashioning appropriate remedies under the PLRA. District courts, having presided over these cases for years and sometimes decades, develop in-depth knowledge of the plaintiffs' claims, the defendants' institutional organization and structure, and, concomitantly, the practical impediments that particular measures will face (or the impediments that have rendered prior measures ineffectual). As a result, the district courts are in the best position to evaluate what actions are possible, what will be effective, and what actions are required to ameliorate a constitutional violation. *See Plata*, 563 U.S. at 541 ("The adversary system afforded the court an opportunity to weigh and evaluate evidence presented by the parties."); *Morales Feliciano*, 378 F.3d at 54–55 (recounting the district court's two-decade involvement in the litigation and its efforts at using less-intrusive means); *cf. Benjamin*, 343 F.3d at 52 ("Giving appropriate

deference to the district court, which has overseen these efforts for over twenty years, we see no reason to disturb either conclusion."). In recognition of this superior frame of reference, the factual findings necessary for a need-narrowness-intrusiveness determination are reviewed only for clear error. *See Plata*, 563 U.S at 541 (explaining that the three-judge panel's "weighing of the evidence" related to narrowness "was not clearly erroneous").

The panel majority, by contrast, gives little weight to the district court's unique role. Unlike the Supreme Court and the other circuits that have confronted the problem, its opinion contains no acknowledgment of the district court's familiarity with the underlying constitutional violations, the recalcitrant actions of the defendants, or how that recalcitrance affected the inmates with serious mental health needs. Indeed, it is very difficult to find any deference at all to the district court's factual findings. Rather, much like its deliberate indifference analysis, the majority treats the need-narrowness-intrusiveness inquiry as one that is purely legal and therefore subject to de novo review. Such an approach cannot be reconciled with *Plata*, nor with that of our sister circuits. *See generally* Charles Allen Wright, *The Doubtful Omniscience of Appellate Courts*, 41 Minn. L. Rev. 751 (1957).

## C.

When we evaluate the district court's injunction in light of IDOC's history of noncompliance and appreciate, as we should, the superiority of the district court's institutional vantage point to our own, it is clear that the injunctive relief crafted here passes muster under the PLRA.

As in the cases discussed above, the conditions allowing a
district court to be more focused in its remedial efforts are all
present. There is no question that there is a constitutional vi-
olation that has defied correction. *See* R.2460 at 27–28 ("While
some efforts have been successful, including the recent expan-
sion of the use of tele-psychiatry, the Defendants ha[d] failed
to achieve a minimum level of medical service to avoid the
label of cruel and unusual punishment."). And IDOC's re-
sponse has been both begrudging and "reactionary." R.2516
at 4 ("In its Orders, this Court specifically found that the De-
fendants' efforts to comply with the Settlement Agreement (or
its own general directives) only came at the time of, or after,
the filing of the Plaintiffs' initial Motion. Simply put, the De-
fendants' actions have been largely reactionary." (citation
omitted)).

At the outset, the record is replete with evidence that the
central contributing factors to IDOC's failure to provide con-
stitutionally adequate mental health care (if not the only one)
is its staffing shortage. Any *effective* remedy, therefore, must
include guidelines for staffing levels. However, there was no
serious effort by IDOC to participate in the crafting a remedial
order. After the district court granted the plaintiffs' motion
for a permanent injunction, it asked IDOC to "submit their
proposed action to address the constitutional deficiencies"
outlined in the court's order.[35] With respect to the most criti-
cal aspect of relief—staffing levels—IDOC proposed the fol-
lowing:

> The Department shall adopt a staffing plan and
> achieve a level of staffing that provides a

---

[35] R.2460 at 50.

> sufficient number of mental health staff of var-
> ying types to provide class members with ade-
> quate and timely evaluations, treatment, and
> follow-up consistent with contemporary stand-
> ards of care. The Department may use any rea-
> sonable means that it determines in its profes-
> sional judgment to be appropriate to provide
> sufficient staffing.[36]

The district court legitimately concluded that this general recitation of its constitutional responsibilities did not reflect a serious effort by IDOC to contribute to the remedial analysis:

> The Defendants' most egregious attempt to cure
> their constitutional deficiencies is set forth in
> their proposal regarding mental health staffing.
> Defendants propose adopting the vague re-
> quirement that they have "a staffing plan and
> achieve a level of staffing that provides suffi-
> cient number of mental health staff of varying
> types to provide class members with adequate
> and timely evaluations, treatment and fol-
> low-up consistent with contemporary stand-
> ards of care." Yet, Defendants know they are
> understaffed, and they also know the staffing
> levels which are necessary to provide adequate
> care. In fact, Defendants are fully aware of all
> these deficiencies, as they have both

---

[36] R.2473-1 at 4.

acknowledged the staffing problems at the Illinois Department of Corrections.[37]

Thus, absent any helpful contribution by IDOC, the district court turned to the staffing levels set forth in *IDOC's own 2014 staffing plan*. Notably, IDOC authored this plan and represented that, at least in 2014, it would "satisfy its constitutional duty to provide mental health care to seriously mentally ill … offenders."[38] According to the plan, it reflected "a measured approach for achieving the necessary transformation within a reasonable timeframe."[39]

Given that, in 2014, this plan represented IDOC's best assessment of the staffing that would bring it into constitutional compliance in both a "measured" way and "reasonable" timeframe, it is difficult to see how the relief fails the need-narrowness-intrusiveness test. The district court's decision to use IDOC's remedial plan both recognizes that IDOC is in the best position to assess the staffing levels that will allow it to deliver constitutionally compliant mental health care and that it is unlikely to saddle itself with unnecessary burdens. Moreover, as the district court recognized, at this point, the 2014 numbers represent a bare minimum. They may not be sufficient to correct the Eighth Amendment violation. The number of prisoners with mental health needs only has grown over the past seven years, and there is some evidence that the proposed staffing numbers are no longer sufficient. Nevertheless, because the 2014 staffing levels never had been

---

[37] R.2516 at 4–5 (citation omitted).

[38] 2014 Remedial Staffing Plan at 1.

[39] *Id*. at 2.

achieved, the district court could not say definitively that they would be inadequate. As such, they represented a legitimate estimate to achieve a constitutional floor.

Although acknowledging that "specific numeric target[s]" do not "automatically violate[] the PLRA," Majority Op. 17, my colleagues nevertheless fault the district court for imposing staffing targets that did not leave much to IDOC's discretion, *see id*. at 18 (quoting *Plata*, 563 U.S. at 533). However, the remedial plan was a product of IDOC's discretion: All of the staffing numbers used by the district court in its permanent injunction *originated* with IDOC. The district court did nothing more than order IDOC to a conform to a plan of its own making. Nothing in this action intruded on IDOC's decision-making regarding allocation of resources, prison administration, or public safety.

Here, the district court made specific findings establishing that its permanent injunction "extend[s] no further than necessary to correct" the Eighth Amendment violation, "is narrowly drawn," and "is the least intrusive means necessary to correct the violation" of the inmates' rights. I would therefore affirm the judgment of the district court entering permanent injunctive relief against IDOC.